

U.S. Department of Justice

*United States Attorney
Eastern District of New York*

CPK/KPO
F. #2021R00405

*610 Federal Plaza
Central Islip, New York 11722*

December 8, 2025

ECF

Honorable Gary R. Brown
United States District Judge
United States District Court
940 Federal Plaza
Central Islip, New York 11722

   Re: United States v. Roya Jafari Hassad
     Criminal No. 22-545(S-2)(GRB)

Dear Judge Brown:

  The government respectfully submits this letter in advance of defendant Roya Jafari Hassad's ("Hassad" or "defendant") sentencing hearing, which is scheduled for December 15, 2025. As the Court is aware, on December 11, 2024, following a multi-week trial, a jury found the defendant, a physician, guilty of 8 counts of prescribing oxycodone without a legitimate medical purpose in violation of the Controlled Substances Act, 21 U.S.C. Section 841(a) (the "Drug Distribution Counts"). Subsequently, on April 17, 2025, defendant pled guilty to Count 19 (the "Healthcare Fraud Count") of the second superseding indictment which charged health care fraud (a count previously severed from the 2024 trial).

  The underlying facts regarding defendant's crimes are straightforward and deplorable. Regarding the Drug Distribution Counts, the defendant sold prescriptions for high-strength, highly addictive oxycodone directly to addicts from a crooked medical office in Nassau County. The addicts who testified at trial and bought oxycodone prescriptions from the defendant were not only oxycodone addicts but also included at leat one heroin addict who testified at the trial that he re-sold the oxycodone pills to raise cash to buy heroin for his heroin addiction. (Tr.[1] 1468-1495). The defendant sold these drugs not for any legitimate medical or professional purpose, but for the cash—up to $760 for every monthly prescription of oxycodone—massive amounts of cash coming into her medical practice. As for the Healthcare Fraud Count, the defendant fraudulently billed insurance providers for procedures which were

---

  [1] "Tr." Refers to the transcript of the trial of the drug distribution counts.

unnecessary or never performed.[2] The restitution sought is limited to both the procedures identified in the indictment and only for a small subset of defendant's patients.

For the reasons set forth below, the government respectfully submits that the Court should impose a sentence of 84 months' imprisonment, to be followed by three years' supervised release, a $200,000 fine and $800 special assessment for the Drug Distribution Counts and, on the Healthcare Fraud Count, the government requests that the sentence include a restitution award of $152,765 as agreed to by the parties. Although the sentence on the Healthcare Fraud Count may be consecutive to the sentence imposed on the jury's counts of conviction, the government recommends that the sentence for all counts of conviction not exceed 84 months' imprisonment.

I. Relevant Facts

A. The Opioid Epidemic

Through her criminal conduct, the defendant fed the addictions of vulnerable people, exacerbating the opioid crisis, a public health emergency.

As explained at trial, oxycodone is a Schedule II opioid—that is, an addictive painkiller. Federal law "creates a comprehensive, closed regulatory regime" governing controlled substances, and the regime "places substances in one of five schedules based on their potential for abuse or dependence" and their "accepted medical use" and related safety. Gonzalez v. Oregon, 546 U.S. 243, 250 (2006). Schedule II drugs "are the most dangerous medications that are prescribed for legitimate medical purposes . . . they're schedule two because they have a high abuse potential." (Tr. 900)

Legitimately dispensed oxycodone for acute injuries is typically a prescription for only a few days. (Tr. 935.) In contrast, this case involved hundreds of 30-day supply prescriptions of oxycodone 30 mg. Such a dosage is often given to late-stage cancer patients. Oxycodone 30 mg pills are for "patients that have had multiple things done to them to try to get them better or patients who are dying from cancer, who become tolerant and we need to make them more comfortable as they're dying." (Tr. 1004)

The risk to human lives is clear. The risks of oxycodone are serious, for a doctor, "[t]he worse thing you could do is kill somebody with an overdose. They could take more than prescribed or have a reaction and stop breathing and die. That happens. The other thing is they can become addicted to medications like this, and then start a whole downward spiral down the

---

[2] Regarding victims, the government understands that at least one victim wants to address the court, Christina Peragine, the brother of the late Frankie Peragine ("Peragine"), a patient of defendant. The government views Christina as the family member representative of Frankie Peragine, someone directly and proximately harmed as a result of the commission of health care fraud, a federal offense. 18 USC § 3771(e). Indeed, Peragine's medical account was billed by defendant for medical services by defendant that were purportedly rendered by defendant to Peragine after he had died. Tr. 111-118.

addiction pathway, where they lose friends, family, they lose everything for the sake of taking an opioid." (Tr. 939).

Indeed, from 1999 to 2020, 565,000 Americans died of opioid-involved overdoses. See Jonathan Duff et al., Cong. Rsch. Serv., IF12260, The Opioid Crisis in the United States: A Brief History (2022), https://crsreports.congress.gov/product/pdf/IF/IF12260. Those numbers are accelerating. Since 2017, more than 130 people in the United States have died *every day* from overdose opioid deaths. See U.S. Dep't of Justice, Off. of the Inspector Gen., Review of the Drug Enforcement Administration's Regulatory and Enforcement Efforts to Control the Diversion of Opioids 1 (2019), https://www.govinfo.gov/content/pkg/GOVPUB-J37-PURL-gpo126560/pdf/GOVPUB-J37-PURL-gpo126560.pdf. And in 2009, nearly one-third of people aged 12 and over who abused drugs for the first time started with non-medical use of a prescription drug. See United States v. Lewis, 521 F. App'x 109, 111 (4th Cir. 2013).

The proliferation of pill mill clinics significantly contributed to the opioid crisis. Id. at 3-4. Prescription drugs were the initial driver of the opioid crisis: nearly 80% of individuals who abuse illicit opioids first abused a prescription opioid. Id. at 2. Locally, the opioid crisis has continued to worsen, as deaths due to opioid overdoses generally have increased over time in both New York State and New York City. See Off. of N.Y.S. Comptroller, Off. of Budget Policy & Analysis, Continuing Crisis—Drug Overdose Deaths in New York 1 (2022), https://www.osc.ny.gov/files/reports/pdf/drug-overdose-deaths.pdf. A fatal overdose occurs every four hours in New York City. See N.Y.C. Off. of Special Narcotics Prosecutor, NYC Overdose Deaths, https://www.snpnyc.org/opioid-crisis/ (last visited Dec. 4, 2025).

The economic burden of the opioid crisis amounts to an estimated $78.5 billion every year. See U.S. Dep't of Justice, supra, at 2. This amount includes $28.9 billion in healthcare and substance abuse treatment costs. These staggering economic costs are overshadowed only by the devastating impact of opioid abuse on communities and families throughout the United States.

B.   The Oxycodone Scheme

Defendant issued oxycodone prescriptions for cash. The jury convicted the defendant of felony counts of prescribing oxycodone without a legitimate medical purpose. As described in the Presentencing Investigation Report ("PSR") and proven at trial, the defendant operated a pill mill in which she unlawfully distributed the opioid oxycodone. See United States v. Capistrano, 74 F.4th 756, 765 n.1 (5th Cir. 2023) ("A 'pill mill' is a colloquial term for a medical clinic from which practitioners distribute controlled substances without 'medical necessity or therapeutic benefit.'" (citation omitted)). The defendant knowingly violated the narcotics laws and became a mere drug dealer in a white coat.

Defendant, in her objections to the PSR, challenges the statement that "defendant submitted various prescriptions for oxycodone many without patient appointments or examinations and all without legitimate medical purpose." PSR at p. 7, para. 22. The trial testimony supports the statement from the PSR. With some victims, the defendant did not even engage in the façade of a medical practice. Michael Bono ("Bono") said that the defendant never gave him a physical exam but she did give him instructions on how to act as a patient and an oxycodone prescription; the defendant told Bono not to talk about his oxycodone prescriptions.

(Tr. 664-65). Charles Rodriguez ("Rodriguez") testified that he performed computer work for the defendant but would not receive a physical exam from her before getting an oxycodone prescription. (Tr. 665). Appointments with the defendant would take about 5 minutes for Rodriguez. (Tr. 763). Rodriguez also testified that he had cocaine in his urine around the same time that the defendant's urine tests were conducted and this would have shown in his system. Either the defendant never ran the urine tests that she purported to run or she didn't pay attention to the real results of the tests. (Tr. 773). Similarly, Brandon Sohn ("Sohn") was a heroin addict when he was being prescribed oxycodone by defendant and Sohn was reselling the oxycodone to raise cash for his heroin purchases. Sohn had heroin in his urine around the same time the defendant took urine tests which meant that, as with Mr. Rodriguez, the defendant either didn't run the urine tests she said she was running or didn't pay attention to the results. (Tr. 1468, 1486, 1492, 1495). The defendant continued prescribing oxycodone either without doing the urine toxicology tests or without reviewing the results. In sum, defendant kept the oxycodone prescriptions flowing to her patients, regardless of any urine test results, as long as she got paid.

The evidence at trial showed that the defendant sold oxycodone prescriptions to patients for hundreds of dollars a month. The counts of conviction relate to oxycodone prescriptions the defendant sold to an undercover officer who paid $350 for a two-week prescription and approximately $700-725 for a monthly prescription of oxycodone. Other than payment, little else happened at the appointments. GX 42, Exhibit A hereto. The undercover officer was not alone in being supplied drugs by the defendant; several other patients testified that the defendant sold them oxycodone prescriptions for cash. (Tr. 795 (Rodriguez, "I was paying for the Oxycodone prescription."); Tr. 1486 (Sohn, Q. "What were you having to pay to get the oxycodone? A When the quantity size -- well, when we started moving to a month intervals, I believe the price was around $600, but it ended up going up to 700. I don't recall eight, but I know it went up to seven."); Tr. 735-36 (Angela Giordano, "Q You said you got a prescription for oxycodone at the first appointment? A. I did. Q. Did you pay for it? A. I did. Q. How much? A. $500.); Tr. 1300 (William Felice, "Q. What amount did you pay at the appointments during the time period in which you were receiving a 30-day prescription? A. Like I said before, it was 600 and then I remember going up to 760. I don't remember at what point it went up to 760.")).

As part of defendant's drug trafficking scheme, defendant used the term "biofeedback" as a cover for what the patients were paying for but, as patients knew, and the evidence showed, there was no biofeedback and they were paying for oxycodone prescriptions. In fact, the words "biofeedback" and "prescription" were used interchangeably by patients and the defendant. One long term patient texted the defendant and asked her to "send my biofeedback in then because I'm a couple days overdue." GX 77, attached hereto as Exhibit B. As shown in the defendant's text message conversation with this patient, GX 77, page 1 (attached as Exhibit B) and heard in the September 3 call, GX 37T, the transcript attached hereto as Exhibit C), there was a two-step process. The victims [patients] would share their payment information with the defendant and she would then submit the prescription for oxycodone. There was no appointment, no examination; step one, money to the defendant; step two, defendant issues an oxycodone prescription. This two-step process wasn't a one-off event, a few weeks after sending the first prescription, she sent a second prescription for the same patient (GX 77, pg. 2-4) after he said he needed it and sent her the pharmacy information. Again, there was no medical evaluation; there was only a request for the drugs and payment before she would distribute the drugs.

The government's expert witness, Dr. Brian Durkin reviewed medical records and listened to recordings from the undercover officer's visit and testified that defendant was preoccupied with payment (Tr. 999) and the oxycodone prescriptions to the undercover agent were not issued for a legitimate medical purpose. Most telling is the chart of the undercover officer's visits which shows that (i) he was only examined by defendant at the first appointment, (ii) defendant did not meet with the undercover agent on 4 of the visits and (iii) defendant prescribed oxycodone at every visit. (GX 42, Exhibit A).

### C.   The Healthcare Fraud Scheme

In addition to flooding her patients with oxycodone, the defendant submitted false and fraudulent claims to Medicare and private benefits programs for services that were not rendered to them; she charged insurance companies and was paid for services she did not provide. (PSR ¶ 19-20). Specifically, even limiting the sample to the procedures listed in the indictment and a small subset of patients, the defendant was paid a total of $152,765.14 from eight providers for fraudulent bills. (PSR ¶ 25).

## II.   Guidelines Calculation

The government agrees with the PSR's calculation that the defendant's total offense level is 30 (see PSR ¶¶ 29-49), as set forth below:

Counts of Conviction

| | |
|---|---:|
| Base Offense Level (§§ 2D1.1(a)(5), 2D1.1(c)(8)) | 30 |
| Plus:   Use of Special Skill (§ 3B1.3) | +2 |
| Total: | 32 |

Healthcare Fraud Count

| | |
|---|---:|
| Base Offense Level (§§ 2B1.1) | 6 |
| Plus:   Loss Amount (§ 2B1.1(b)(1)(G)) | +10 |
| Plus:   Use of Special Skill (§ 3B1.3) | +2 |
| Total: | 18 |

| | |
|---|---:|
| Adjusted Offense Level (Grouping): | 32 |
| Less:   Zero-Point Offender (§ 4C1.1(a) and (b)) | -2 |
| Total: | 30 |

The parties agree with the PSR's determination that the defendant's criminal history category is I. (See PSR ¶ 60). Thus, the total offense level of 30 carries an advisory Guidelines range of 97 to 121 months' imprisonment. (See id. ¶ 84). The government agrees

5

with the advisory Guidelines range as calculated by Probation in the PSR. Plea Agreement at ¶ 2. As explained above, the defendant's PSR objections to certain facts about the absence of medical appointments before oxycodone prescriptions should be rejected.

Probation issued its sentence recommendation ("Prob. Rec.") in conjunction with the disclosure of the PSR to the parties on November 12, 2025. In its recommendation, Probation recommends a sentence of 97 months' imprisonment, a fine in the amount of $15,000, restitution of $152,765.14, 3 years supervised release and $800 special assessment. See United States Probation Department Sentence Recommendation, dated November 12, 2025 (the "Prob. Rec."), at 1. In the Prob. Rec., Probation explained its rationale behind recommending a sentence of 97 months' imprisonment, which accounted for, inter alia, the defendant's "deplorable conduct" and "prescribing oxycodone without a legitimate medical purpose, contributing to the continuing drug epidemic within the United States." Id. at 8. Probation also noted the defendant's lack of a prior criminal history. Id. at 7. Importantly, however, Probation determined that the severity of the defendant's criminal conduct warranted an extended custodial term, 97 months' imprisonment. Id. at 8.

### III. The Appropriate Sentence

#### A. Legal Standard

##### 1. Sentencing

The Court "shall impose a sentence sufficient, but not greater than necessary," to achieve the goals of sentencing. 18 U.S.C. § 3553(a). "[I]n determining the particular sentence to be imposed," the Court "shall consider" certain factors set forth in § 3553(a), including the applicable Guidelines range. Id.

The Court must "correctly calculat[e] the applicable Guidelines range" because a miscalculation constitutes "significant procedural error." Gall v. United States, 552 U.S. 38, 49, 51 (2007). The Guidelines range "should be the starting point and the initial benchmark." Id. at 49. Still, the Court "should not presume" the reasonableness of the calculated Guidelines range and "must make an individualized assessment based on the facts presented." Id. at 50.

The Court also must "adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." Id. at 51. A "significant departure or variance from the recommended Guidelines range 'should be supported by a more significant justification than a minor one.'" United States v. Martinez, 110 F.4th 160, 178 (2d Cir. 2024) (quoting United States v. Mumuni, 946 F.3d 97, 107 (2d Cir. 2019)). The Court "must faithfully evaluate the record to ensure the sentence imposed accurately and adequately reflects the seriousness of the offense conduct." Id. (quoting Mumuni, 946 F.3d at 106).

##### 2. Fines

The Court "must consider the Guidelines recommendation," and the "Guidelines instructs the district court to 'impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.'" United States v. Dugan, 373 F. App'x 114, 117-18 (2d Cir. 2010) (citations omitted); see also U.S.S.G.

6

§ 5E1.2(a). In imposing a fine on a defendant, the Court, as relevant here, "shall consider," among other things, the § 3553(a) factors; "the defendant's income, earning capacity, and financial resources"; "the expected costs to the government of any imprisonment" or "supervised release"; and the degree to which a fine would "impair the ability of the defendant to make restitution." 18 U.S.C. § 3572(a), (b). No impairment of defendant's ability to make restitution is presented by a fine of $200,000, as defendant is a multi-millionaire and the restitution required here is less than 5% of defendant's multi-million dollar net worth. Combined, the restitution and the recommended fine of $200,000 are only 10% of defendant's net worth. PSR at ¶ 75, p. 21.

  B. <u>The Appropriate Sentence</u>

    As set forth below, an 84 month sentence would satisfy the purposes set forth in 18 U.S.C. Section 3553(a). Regarding a fine, although the PSR only recommends a $15,000 fine (PSR Sentencing Recommendation at 1), the government believes that a fine of $200,000 fine on the jury counts of conviction is proper. <u>See, e.g.</u>, <u>United States v. Zukerman</u>, 897 F.3d 423, 429 (2d Cir. 2018) (affirming above-Guidelines fine despite defense argument that fine was unnecessary because of Guidelines prison sentence imposed); <u>United States v. Rosen</u>, 296 F. App'x 188, 193-94 (2d Cir. 2008) (affirming $150,000 fine despite separate forfeiture of $400,000, which was already $100,000 greater than amount defendant personally laundered). As for the proper considerations, defendant's financial resources are a consideration. Defendant is a multi-millionaire and the proposed fine, together with the $152,000 restitution, will not have a substantial impact on her net worth. The fine should, like the restitution, be payable immediately. Defendant was paid a significant amount of cash, month after month, by patients for their oxycodone prescriptions and the proposed restitution does nothing to compel the return of those sums. Because there is a substantial pecuniary gain in the Drug Counts of Conviction and no restitution, a significant fine is warranted. 18 U.S.C. § 3571(d). There is a need to deprive the defendant of the proceeds of her offense. Federal Criminal Practice: A Second Circuit Handbook, § 42-44. In this case, the restitution recommended is only on the Health Care Fraud count, simply for insurance companies who were billed for and paid for, among other things, undelivered medical services.

    The nature and circumstances of the offenses counsel in favor of a substantial prison sentence. Unlawful narcotics dealing is among "the most serious crimes there is." <u>United States v. Fiore</u>, 467 F.2d 86, 90 (2d Cir. 1972). Put another way, "drug-related crimes are polluting . . . urban centered, frequently destroying the lives of the victims who become addicted to the illegal substances, and are leading to overall societal and familiar decay." <u>Elbert v. United States</u>, No. 09-CR-285 (VLB), 2014 WL 4182400, at *3 (D. Conn. Aug. 21, 2014). And the "opioid epidemic has wrought a terrible toll on our nation and so many communities within it." <u>United States v. McKinnie</u>, 21 F.4th 283, 294 (4th Cir. 2021); <u>see also</u> <u>Robinson</u>, 892 F.3d at 215 (holding that district court does not abuse its discretion "in considering the effect of the opioid epidemic" in state). In particular, oxycodone is "one of the most dangerous drugs available on the black market today," and flooding oxycodone on the streets helps "to perpetuate the horrible pill epidemic that is, in turn, fueling the heroin epidemic that is leading to more and more deaths each year." <u>United States v. Thompson</u>, No. 15-CR-168 (AWT), 2022 WL 1239946, at *2-3 (D. Conn. Apr. 27, 2022) (citation omitted) (168-month sentence).

The defendant's conduct was particularly egregious because, for greed, she abused the trust conferred upon her. The defendant was a doctor. She was someone that should have had her patient's best interests in mind. Instead, she abused this position of trust and elected to ignore all the signs that patients demonstrated that she was feeding addiction and acting as a drug dealer. Such signs included failed urine toxicology tests, acceptance of no appointment and willingness to pay for an oxycodone prescription. That kind of abuse of trust calls for an extensive prison term.

In order to appreciate the true impact of the defendant's choice to distribute drugs, feed addiction and disregard facts that demonstrated the clear, criminal nature of her conduct, the Court need look no further than the testimony at trial. This is a case about drug dealing, about selling dangerous, highly addictive drugs for cash thereby exacerbating an epidemic – directly as a result of defendant's greed. Both the undercover agent and the other patients who testified discussed the money centric methods of defendant's medical practice.

The 3553(a) factors also require that the sentence be just punishment for the offense. Here, defendant was convicted of 8 counts of drug trafficking. Such convictions of a doctor reflect an abuse of trust that a normal drug dealer does not have with a customer, making defendant's drug dealing worse than the usual drug trafficker presenting for sentencing. The defendant's conduct had real, detrimental impacts on her patients. Feeding addiction for years, in some instances endangering their lives and well-being with every dose prescribed, calls for a substantial term of imprisonment.

General deterrence is important. If a doctor convicted of 8 felony counts of prescribing oxycodone without a legitimate medical purpose as well as health care fraud does not get a substantial prison sentence, there will be little deterrence for the medical community. "General deterrence is a major factor" in narcotics cases. United States v. Bowman, No. 92-CR-392 (LAP), 2020 WL 470284, at *2 (S.D.N.Y. Jan. 29, 2020) (noting that 26 years of incarceration is sufficient to effect general deterrence); see also 18 U.S.C. § 3553(a)(2)(B). "The need for general deterrence is particularly acute in the context" of crimes like these, because health care professionals such as the defendant "are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed." United States v. Johnson, No. 16-CR-457 (NGG), 2018 WL 1997975, *5 (E.D.N.Y. Apr. 27, 2018) (quoting United States v. Stein, No. 09-CR-377 (JBW), 2010 WL 6781222, at *3 (E.D.N.Y. Feb. 25, 2010)).

Furthermore, a significant carceral sentence will make clear that the country's drug laws will be enforced vigorously, especially where those laws have been broken by doctors or other healthcare professionals who are entrusted to heal, not hurt, the community. The sentence must be set to appropriately deter licensed professionals other than the defendant. See United States v. Maniego, 710 F.2d 24, 29 (2d Cir. 1983) (rejecting defense argument that sentence was unfair "example to the Bar" because "deterrence is not an inappropriate sentencing objection 'with respect to conduct for which the defendant is blameworthy'" (citation omitted). Indeed, on the government's appeal, the Eleventh Circuit has vacated a sentence in a health care fraud case where the district court's reasoning suggested that doctors, pharmacists, lawyers, and other licensed professionals "cannot be deterred by the threat of a prison sentence from

8

committing a crime that will result in loss of their license anyway." United States v. Howard, 28 F.4th 180, 208 (11th Cir. 2022). "Anyone with a license to practice a professional could abuse the privileges that come with that license to commit crimes without fear of being sent to prison in order to deter others from using their licenses from using their licenses to commit similar crimes." Id. "That cannot be right, and it isn't right." Id.

Opioid diversion is a particularly pernicious crime for several reasons. Not only does diversion harm the community by feeding the cycle of opioid addiction, but it is relatively easy to conceal. Even systematic opioid diversion by a single unscrupulous pharmacist or doctor can go on for years before it is detected by law enforcement. Indeed, here, the government had to conduct a long and expensive undercover investigation to prove its case. Accordingly, a significant prison sentence is needed to warn similarly situated individuals that such crimes come with serious consequences.

Further, a substantial prison sentence is necessary to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6)—a sentencing requirement to "consider nationwide sentencing disparities," United States v. Gahagen, 44 F.4th 99, 113 (2d Cir. 2022) (quoting United States v. Frias, 521 F.3d 229, 236 (2d Cir. 2008)). An 84-month sentence here is consistent with sentences imposed on comparable or less culpable pill-mill defendants who did not serve as knowing doctors in the scheme yet worked with similar amounts of oxycodone. See, e.g., United States v. Toney, No. 22-4687, 2023 WL 4181308, at *1 (4th Cir. June 26, 2023) (affirming 40-month sentence imposed on 30-year-old pharmacy technician, not pharmacist, based on same offense level and criminal history category as this defendant); United States v. Wright, No. 21-1389, 2022 WL 4298115, at *1 (3d Cir. Sept. 16, 2022) (affirming 110-month sentence imposed on crew chief for 36.7 grams of oxycodone, or more than 1,300 pills, over eight months); United States v. Washington, 775 F. App'x 118, 119-20 (4th Cir. 2019) (affirming 63-month sentence imposed on interstate courier for 127.2 grams of oxycodone over two years); United States v. Faison, 710 F. App'x 64, 66 (3d Cir. 2018) (affirming 120-month sentence imposed on crew member, not chief, in crew of about 50, based on 41.9 grams of oxycodone over seven months); United States v. Azor, 881 F.3d 1, 4-6, 8-9 (1st Cir. 2017) (affirming 36-month sentence imposed on one-time courier carrying 1,075 oxycodone 30 mg pills on him at direction of others); United States v. Hipple, 608 F. App'x 504, 505 (9th Cir. 2015) (affirming 60-month sentence imposed on drug dealer based on single attempted transaction of 900 oxycodone 30 mg pills); United States v. McGee, 736 F.3d 263, 267, 273 (4th Cir. 2013) (affirming 55-month sentence imposed on interstate courier carrying 246 oxycodone pills and 151 oxymorphone pills on him); Lewis, 521 F. App'x at 110 (affirming 92-month sentence on courier carrying 400 oxycodone 30 mg pills and 100 oxymorphone 40 mg pills during traffic stop); United States v. Tadlock, 376 F. App'x 296, 297 (4th Cir. 2010) (affirming 41-month sentence imposed on 50-year-old crew member, not chief, with same Guidelines range as this defendant); United States v. Shropshire, 342 F. App'x 224 (8th Cir. 2009) (affirming 48-month sentence imposed on street dealer based on 16 grams of actual oxycodone in four sales).

Therefore, because it is sufficient but not necessary to reflect the seriousness of the defendant's crimes, the need for deterrence as to her and doctors more generally, and the need to prevent sentencing disparities among similar defendants, an 84-month sentence is appropriate here. The sentence is necessary to show to the defendant and others that those

entrusted with medical licenses must take those responsibilities seriously—especially as to the most addictive and dangerous drugs in the pharmacy—and must not be swayed by the lucrative gains that are possible with oxycodone trafficking

IV.    Conclusion

For the foregoing reasons, the government respectfully submits that the Court should impose a sentence of 84 months' imprisonment, to be followed by three years' supervised release, restitution of $152,000, a $200,000 fine and $900 special assessment, which would be sufficient, but not greater than necessary to achieve the goals of sentencing.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:   */s/ Charles P. Kelly*
Charles P. Kelly
Katherine P. Onyshko
Assistant U.S. Attorneys
(631) 715-7866/7890

cc:   Defense Counsel (by ECF and email)
Clerk of the Court (GRB) (by ECF and email)
U.S.P.O. Ashtin Audain (by email)