

U.S. Department of Justice

United States Attorney
Eastern District of New York

610 Federal Plaza
Central Islip, New York 11722

JLG:CPK/KPO
F. #2021R00405

January 18, 2026

By ECF

Honorable Gary R. Brown
United States District Judge
United States District Court
100 Federal Plaza
Central Islip, New York 11722

        Re:    United States v. Roya Jafari Hassad
                 Criminal No. 22-545 (S-2) (GRB)

Dear Judge Brown:

        The government respectfully submits this letter, as directed by the Court during the December 15, 2025 sentencing conference in the above-captioned matter, to set forth its position with respect to the impact, if any, that the fatal overdoses of certain of the defendant's patients[1] have on her upcoming sentencing.

        For the reasons set forth below, the government respectfully submits that, while the Court can and should consider the fact of these overdose deaths as a relevant sentencing factor pursuant to 18 U.S.C. § 3553(a) – particularly because they throw into high relief just how dangerous it is for a licensed medical professional to exploit her patients' opioid cravings to line her own pockets (see Gov't Sent. Ltr., ECF Dkt. No. 141 ("Gov't Sent. Ltr,") pp. 2-3, 6-8 (discussing the opioid epidemic)) – they do not alter the defendant's advisory sentencing Guidelines range.

        As a threshold matter, the government respectfully submits that, because the cause of death of these patients was the result of mixed drug toxicity that included deadly fentanyl, the evidence would be insufficient to prove that the decedent-patients' use of the defendant's prescribed oxycodone was either an independently sufficient cause or the proximate cause of their respective deaths.[2] Moreover, the evidence overwhelming shows that the

---

[1] During the court proceeding, Your Honor referenced one patient in particular; this letter discusses that patient and one other, both of whose overdose deaths came to light during the course of the federal investigation.

[2] See Burrage v. United States, (Scalia, J.) 571 U.S. 204, 218-19 (2014) ("We hold that, at least where use of the drug distributed by the defendant is not an independently sufficient

defendant, like most for-profit drug dealers, had no intention of killing – accidentally or otherwise – her patients, because that would cut off her regular, substantial cash-income stream. As such, there is no basis to apply the higher second-degree murder Guidelines.

Therefore, the government respectfully submits that there are no material factual issues in dispute that would necessitate a *Fatico* hearing; that the Guidelines as set forth in the PSR are appropriately calculated (see Govt. Sent. Ltr., pp. 5-6); and that sentencing may proceed as scheduled, on March 2, 2026.

I. Relevant Factual and Procedural Background

The government respectfully rests on its recitation of the general factual and procedural background of this matter as set forth in its December 8, 2025 sentencing letter (ECF Dkt. No. 141).[3]

As noted above, on December 15, 2025, this Court inquired *sua sponte* as to whether there was a demonstrable link between the prescription drugs distributed by the defendant and a fatal overdose, which, if so, could affect the sentencing Guidelines calculation. See Hr'g. Tr. pp. 5-6.

As set forth in material produced to the defendant in discovery and as § 3500 material, including her patient files, the government respectfully submits that the evidence demonstrates, unequivocally, that two of the defendant's patients – referred to herein by their initials only, as "F.P." and "A.M.D." – died of accidental drug overdoses during the time period that they were both being prescribed substantial quantities of oxycodone by the defendant. However, as described below, the autopsy reports indicate that these patients' deaths were the result of mixed drug toxicity that included deadly fentanyl. Therefore, even assuming *arguendo* that the government's evidence is sufficient to show that these two patients were prescribed unnecessary oxycodone by the defendant in exchange for payment,[4] and that their use of the defendant's oxycodone was a contributing factor in their overdose deaths, the evidence nevertheless would be insufficient to prove that the decedent-patients' use of the defendant's prescribed oxycodone was either an independently sufficient cause or the proximate cause of their respective deaths.

---

cause of the victim's death …. a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death ...").

[3] Nothing in the instant letter changes the government's positions with respect to the applicable sentencing Guidelines range or the advocated-for sentence in the Govt. Sent. Ltr., as set forth therein. See United States v. Onyegbule, 827 Fed. App'x 126, 128 (2d Cir. 2000) (finding no breach of the terms of plea agreement where, as here, "[t]he government merely responded to the district court's direct inquiries in accordance with its duty of candor to the court.").

[4] As set forth below, the government respectfully submits that the evidence is sufficient with respect to patient F.P., but insufficient with respect to patient A.M.D.

2

A. A.M.D.

A.M.D., a 39-year-old female, was a patient of the defendant's from October 2018 until she died of an overdose fifteen months later, on January 6, 2020.

During that time, A.M.D. received 28 separate prescriptions for 30-milligram oxycodone pills, with a Morphine Milligram Equivalent ("MME")[5] of 180 MME per day – a significant daily opioid dosage, which is often a trigger for prior health plan authorization and which requires careful justification due to overdose risk.[6] However, the government has no information regarding the circumstances or frequency of A.M.D.'s appointments with the defendant; whether or not A.M.D. paid cash for oxycodone prescriptions; or what treatment, if any, was rendered by the defendant.[7]

On January 8, 2020, a Deputy Medical Examiner at the Suffolk County Medical Examiner's Office ("SCMEO") performed an autopsy on A.M.D. and determined that A.M.D.'s cause of death was the result of a mixed drug toxicity – specifically, cocaine, fentanyl, and oxycodone – and that her manner of death was accidental. The government respectfully proffers that, if called to testify, the Deputy Medical Examiner would state that, absent A.M.D.'s use of fentanyl – which was, by far, the largest drug by weight found in A.M.D.'s iliac blood – A.M.D. would not have died.

B. F.P.

F.P., a 29-year-old male, was a patient of the defendant's from January 2020 until early February 2021, when he received a 30-day prescription of oxycodone from the defendant. See, e.g., RJH_002232-34 (F.P. patient file). F.P. died of an overdose on March 5, 2021.[8]

During his time of treatment, the defendant prescribed F.P. approximately twenty separate oxycodone prescriptions. These prescriptions started on January 16, 2020, at a daily dosage of 90 MME per day, and doubled to 180 MME per day by February 26, 2020. These

---

[5] This is a measure of the potency of an opioid dosage.

[6] Records obtained from the New York State Department of Health's Bureau of Narcotic Enforcement ("BNE") reflect no controlled substance prescriptions for A.M.D. from January 2018 to the time she became a patient of the defendant in October 2018.

[7] Therefore, the available evidence is insufficient to demonstrate that A.M.D. was a victim of the defendant in the charged crimes.

[8] As the Court is aware, prior to trial, the government sought to admit evidence regarding the overdose death of F.P., to demonstrate, *inter alia*, the defendant's consciousness of guilt and as an explanation for how the investigation started and why an undercover officer was used. See ECF Dkt. No. 65 (Gov't Ltr. Opp. to Def. Mot., Oct. 29, 2024), p. 5. The Court ultimately granted the defense request to exclude evidence of this overdose death from the trial. See Trial Transcript, pgs. 111-118.

3

substantial dosages create significant overdose risks. See Trial Tr. at 933-936 (Dr. Durkin testimony: "So as you get up above 90 milligrams, the risk of death starts to increase exponentially in patients."), 1003-1005. F.P.'s only other oxycodone prescriptions were from other providers in the fall of 2019. Those prescriptions consisted of Percocet, and the dosage was between 10 to 20 MME daily. See, e.g., RJH_000082 (BNE Records). The defendant continued to prescribe F.P. oxycodone of 180 MME daily until F.P.'s overdose death on March 5, 2021.[9] See Id.

On March 6, 2021, a Deputy Medical Examiner at the Suffolk County Medical Examiner's Office ("SCMEO") performed an autopsy on F.P., and determined that F.P.'s cause of death was the result of a mixed drug toxicity – specifically, alprazolam, fentanyl, and oxycodone – and that his manner of death was accidental. Significantly, oxycodone was the most substantial drug by weight present in F.P.'s femoral blood. Nevertheless, the government respectfully proffers that, if called to testify, the Deputy Medical Examiner would state that, were it not for F.P.'s use of fentanyl, F.P. would not have died.

II. Discussion

The government respectfully submits that, for the factual reasons set forth above, this Court can and should consider at sentencing, pursuant to 18 U.S.C. § 3553(a) and U.S.S.G. § 1B1.4, the fact that two of the defendant's patients fatally overdosed during the time period that they were both being prescribed substantial quantities of oxycodone by the defendant; and moreover, the fact that oxycodone was found to be a contributing factor in their respective cause of death.

However, for the reasons set forth below, these facts do not have an effect on the defendant's advisory sentencing Guidelines range.

A. The Guidelines Typically Used for Crimes Involving Accidental Overdose Deaths Does Not Apply

In circumstances where defendants are convicted of the distribution of narcotics the use of which resulted in an accidental fatal overdose, pursuant to 21 U.S.C. §§ 841(b)(1)(C) and 846, or where such conduct has been stipulated-to by the parties, the applicable sentencing Guideline would be either U.S.S.G. §§ 2D1.1(a)(1) or 2D1.1(a)(2).

Here, of course, the defendant has not been charged or convicted of this crime, nor have the parties stipulated to such conduct. Indeed, for the factual reasons set forth above, the government respectfully submits that, because the but-for causation element discussed in

---

[9] Insofar as the defendant created medical records reflecting an appointment for F.P. after he died, that conduct is part of the health care fraud evidence.

4

Burrage, *supra*, cannot be established, the defendant in fact cannot be charged with either overdose death. Therefore, this section of the Guidelines would not apply here.

B. The Guidelines Cross-Reference to Murder Does Not Apply

As the Court pointed out during the December 15 hearing, U.S.S.G. § 2D1.1(d)(1) applies the first- or second-degree murder Guidelines in cases where "a victim was killed under circumstances that would constitute murder" under Title 18. The Court then inquired as to whether the factual circumstances of the overdose death of F.P. amount to second degree murder, in which case the higher offense level in U.S.S.G. § 2A1.2 would apply. See Hr'g Tr. pp. 6-8.

Second degree murder "is a general intent crime that requires only malice aforethought," and not deliberate premeditation (as does first-degree murder). United States v. Cespedes, No. 11 Cr. 1032 (PAE), 2015 WL 4597539, *3-*4 (S.D.N.Y., Jul. 30, 2025) (citation omitted). This element "is satisfied by: (1) intent-to-kill without the added ingredients of premeditation and deliberation; (2) intent-to-do-serious-bodily-injury; [or] (3) depraved-heart." Id. at *4 (collecting cases).

The government respectfully submits that the facts and circumstances here do not constitute second degree murder. Like most for-profit drug dealers, this defendant had no intention of killing – accidentally or otherwise – her patients, or causing them serious bodily injury. That would have been bad for business. These pay-to-play patients were a key source of her income. In exchange for their regular oxycodone prescriptions, the defendant was receiving easily over $100,000 in cash each year.

The evidence shows that the defendant's main incentive was to keep patients returning to her, cash in hand, for their monthly oxycodone prescription. As a medical professional, her conduct was reckless and dangerous – prioritizing financial gain over the well-being of her patients. But her clear and obvious incentive was to line her own pockets with this steady stream of cash income, and dead patients would be unable to do that. Furthermore, as set forth above, the government would be unable to prove that the oxycodone administered by the defendant was the but-for cause of either of her deceased patients' deaths. Accordingly, the second-degree murder cross-reference does not apply here.

III. Conclusion

For the reasons set forth above, the government's evidence is insufficient to demonstrate that either A.M.D.'s or F.P.'s use of the defendant's prescribed oxycodone was either an independently sufficient cause or the proximate cause of their respective deaths. Further, there is no evidence to suggest that the defendant possessed the requisite malice aforethought necessary to prove that these deaths constitute second-degree murder – rather, the evidence suggests quite the opposite, because the death of a patient would mean irrationally cutting off a steady and reliable stream of income. Therefore, the sentencing Guidelines range as set forth in the PSR is not affected by the fact of these two overdose deaths.

In fashioning its sentencing recommendation to the Court, see ECF Dkt. No. 141, pp. 2, 10, the government had already considered the totality of the defendant's conduct. Although the Court may consider the fact of these overdose deaths as a relevant sentencing

factor pursuant to 18 U.S.C. § 3553(a), for the reasons set forth above, they do not have an effect on the defendant's sentencing Guidelines calculation.  Therefore, the government respectfully submits that there is presently no need for a *Fatico* hearing, and that sentencing of the defendant may proceed as scheduled.

                                            Respectfully submitted,

                                            JOSEPH NOCELLA, JR.
                                            United States Attorney

By:    */s/ Charles P. Kelly*
       Charles P. Kelly
       Katherine P. Onyshko
       Assistant U.S. Attorneys
       (631) 715-7866/7890

cc:    Defense Counsel (by ECF and email)
        Clerk of the Court (GRB) (by ECF and email)
        U.S.P.O. Gregory Giblin (by email)