

**Matin Emouna**
*Admitted in NY, NJ & CT*
memouna@emiklaw.com

February 20, 2026

Honorable Gary R. Brown
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, NY 11722-9014

          RE:    UNITED STATES V. ROYA JAFARI-HASSAD
                 Docket No. 22-CR-545(S-2) (GRB)

Dear Judge Brown:

I, Matin Emouna, Esq., along with James Miskiewicz, Esq., and Bruce A. Barket, Esq., represent Dr. Roya Jafari-Hassad ("Dr. Jafari-Hassad"). Counsel respectfully submits this letter in response to the Government's January 18, 2026, submission concerning the purported relevance of two overdose deaths to the sentencing of Dr. Jafari-Hassad.

The Court asked the parties to brief two questions: whether the guideline range is affected by the deaths, and whether the court may consider the deaths under 18 U.S.C. § 3553. As discussed below, the answer to both is a resounding no because the government's evidence is that Dr. Hassad's prescriptions played no role in either death.

Although styled as a response to the Court's inquiry at the December 15, 2025 sentencing conference, the Government's letter is, in substance, an impermissible attempt to inject into the sentencing proceeding allegations that were never charged, never proven, never stipulated to in the plea, excluded at trial, and entirely absent from both the Plea Agreement and the Presentence Investigation Report ("PSR"). While conceding, as it must, that the Guidelines calculation should not include any factor related to the death of either FP or AMD, the Government nonetheless urges the Court to consider deaths under 18 U.S.C. § 3553(a). The governing law forecloses that effort. Having rung the proverbial bell of "death" (largely by omitting key evidence highlighted herein), the Government now seemingly hopes the Court will consider the deaths when imposing sentence. Respectfully, the Court should disregard that improper suggestion and sentence the defendant without reference to the deaths, which the overwhelming evidence establishes were unrelated to the offenses of conviction.

## I. The Overdose Allegations Are Outside the Offense of Conviction, the Plea Agreement, and the PSR

The overdose deaths now emphasized by the Government were not charged, not admitted, and not stipulated to. They are not identified in the Plea Agreement and are not treated in the PSR as relevant conduct, an offense characteristic, or a basis for any enhancement, departure, or variance.

The advisory Guidelines range was calculated without reference to death, serious bodily injury, or any homicide-related cross-reference. Indeed, the Government expressly agrees that no provision of U.S.S.G. § 2D1.1 applies and that no murder cross-reference is triggered.

Sentencing must remain tethered to the offense of conviction and the conduct admitted or established. *United States v. Booker*, 543 U.S. 220, 259–60 (2005). A sentencing court may not impose punishment based on uncharged allegations or outcomes introduced for the first time at sentencing. *United States v. Concepcion*, 983 F.2d 369, 389 (2d Cir. 1992).

## II. The Government Concedes It Cannot Establish Causation or Legal Culpability

The Government's January 18, 2026 submission contains express concessions that are dispositive. The Government acknowledges that Dr. Jafari-Hassad did not commit murder, lacked malice aforethought, and could not lawfully be charged in connection with either overdose death. The Government further concedes that the evidence is insufficient to establish that any oxycodone prescribed by Dr. Jafari-Hassad was an independently sufficient or but-for cause of death, and that fentanyl was the determinative cause in both cases.

Those concessions are fatal to the Government's effort to urge the Court impose a harsher sentence than it otherwise would have. By doing so, the Government places this case squarely within the constitutional rule announced in *Burrage v. United States*, where the Supreme Court held that enhanced punishment based on death is prohibited unless the defendant's conduct was a but-for cause of that death. 571 U.S. 204, 214–19 (2014). The Court rejected precisely the theory the Government now advances in diluted form—that death may aggravate punishment even where causation cannot be established. *Id.* at 216.

Absent legal causation, death cannot be used as an aggravating sentencing factor.

## III. The Record Does Not Establish That Oxycodone Prescribed by Dr. Jafari-Hassad Played Any Role in the Overdose Deaths

Having conceded that it could not meet the causation standard set forth in *Burrage*, and that the alleged conduct does not affect the Defendant's Guidelines calculation, the Government nevertheless breaches the plea agreement by subtly urging the Court to consider harsher sentence under 18 U.S.C. § 3553(a)(1), the nature and circumstances of the offense and the characteristics of the defendant. Not only is that position in breach of the plea agreement, it is also based on unsupported speculation and the omission of key exculpatory evidence in the Government's possession.

The Government does so by asserting that evidence relating to two overdose deaths "throw[s] into high relief just how dangerous it is for a licensed medical professional to exploit her patients' opioid cravings to line her own pockets." (Government's Letter at 1)[1]. In fact, the Government's

---

[1] If all the Government means by this phrase is that overdose deaths can result from the illegal distribution of controlled substances, it makes an obvious point, one the Court routinely uses to

own recitation of the evidence concerning both deaths fails to support any inference that either of Dr. Hassad's patients died because of Oxycodone she prescribed. In fact, the evidence establishes that Dr. Hassad's conduct had nothing to do with the death of either person.

## Facts Omitted from the Government's Letter Regarding FP's Overdose

According to the Government's Bureau of Narcotics Enforcement ("BNE") records, FP was prescribed alprazolam (Xanax) by a physician's assistant at a mental health practice during the same period—2019 through 2021—and at approximately the same frequency as his visits to Dr. Hassad. (Please see attached **Exhibit A**). Those records further reflect that FP's last prescription for Oxycodone from Dr. Hassad was issued on February 9, 2021, while he received a prescription for Xanax from the physician's assistant on February 25, 2021. *Id.*

A Suffolk County Police Department report reconstructing the circumstances of FP's death, included statements from the decedent's father and sister. (Please see attached **Exhibit B**). Those notes reveal that FP had overdosed on unspecified substances several months before his death and was revived at Huntington Hospital. Thereafter, according to statements by both Mr. Pergine and FP's sister, Stephanie, FP expressed suicidal ideation, specifically stating that he wanted to be with his mother, who passed away in 2018, and that there was "no sense to live." *Id.* Additionally, both father and sister told Suffolk officers that FP had attempted suicide a few days earlier, and subsequently told his family that he "was going away permanently" shortly before his death. *Id.*

As set forth in 3500-SD-6, Suffolk County Deputy Medical Examiner Amy Rapkiewicz advised DEA and HHS-OIG agents that: (1) at the time of death, FP had a relatively low concentration of Oxycodone in his bloodstream; and (2) the fentanyl and alprazolam present were, standing alone, sufficient to cause death without any contribution from Oxycodone. *Id.* Dr. Rapkiewicz also noted that the Oxycodone bottle corresponding to Dr. Hassad's February prescription was empty as of March 5, when FP should have had approximately twelve pills remaining. In her view, this circumstantially suggested that FP may have resorted to fentanyl after exhausting his Oxycodone supply. *Id.* (Please see attached **Exhibit C**)

Dr. Rapkiewicz's surmise about resorting to fentanyl finds support in another statement omitted from the Government's letter, made by FP's sister at the time of his death, when she identified an individual who was not identified as a doctor or medical professional who periodically delivered Xanax from some unknown source to FP. 3500-VP-7. (Please see attached **Exhibit D**)

In short, the Government's suggestion that FP died after consuming Oxycodone prescribed by Dr. Hassad is unsupported by any evidence. The evidence establishes that Dr. Hassad's conduct is unrelated to his death. Even assuming arguendo that FP consumed such Oxycodone, there is no evidence from which the Government can plausibly contend that Dr. Hassad's prescriptions played any causal role in his death.

---

lecture drug offenders (see December 15, 2025 transcript at page 15). But that is not the point the Government is trying to make. Their letter unfairly and without evidence implies that these two deaths were caused by or related to Dr. Hassad's illegal conduct.

**Patient AMD**

As for patient AMD, the Deputy Medical Examiner stated that she had an extensive history of Cocaine and Fentanyl use. In Rapkiewicz's opinion, based on her knowledge of the speed with which drugs metabolize in the body, the level of Cocaine in A.M.D's system was much higher before death, and that the Cocaine was sufficient alone to have caused or played any role in the overdose. *Id.* The Government concedes it lacks evidence that A.M.D. was a victim of the charged offenses. Further, as the Government concedes they lack proof that the prescriptions written by Dr. Hassad were unlawful and not medically necessary (see page 2, and footnote 7)

Accordingly, the Government's suggestion that either death resulted from oxycodone prescribed by Dr. Jafari-Hassad is speculative and unsupported by the record.

## IV. Evidence Excluded at Trial Cannot Be Reintroduced at Sentencing

Consistent with *Burrage*, this Court has already exercised careful gatekeeping in this very case. Prior to trial, the Government sought to introduce evidence of an overdose death. After full briefing and argument, the Court excluded that evidence, recognizing its minimal probative value and extraordinary prejudicial effect, and the risk that it would invite the jury to draw precisely the kind of causal inference the law forbids.

Nothing has changed since that ruling, except that the Government has now formally conceded what this Court recognized earlier: it cannot prove causation. Having failed to meet that burden, the Government may not now repackage the same excluded allegations as sentencing "context."

Sentencing does not provide a second opportunity to rely on allegations excluded at trial. While sentencing courts have broad discretion, that discretion remains bounded by due process and reliability requirements. *United States v. Watts*, 519 U.S. 148, 156 (1997); *United States v. Shonubi*, 998 F.2d 84, 87 (2d Cir. 1993).

## V. The Government's Position Is Barred by the Plea Agreement and Second Circuit Law

Recasting this case around overdose deaths constitutes an impermissible end-run around the plea agreement. Plea agreements are construed strictly against the Government, and the Government breaches the agreement when it seeks, either directly or in substance, to secure a higher sentence than the bargain permits. *United States v. Ready*, 82 F.3d 551, 558–59 (2d Cir. 1996); *United States v. Vaval*, 404 F.3d 144, 152 (2d Cir. 2005); *United States v. Griffin*, 510 F.3d 354, 363–64 (2d Cir. 2007). We are not seeking to vacate the plea, but instead we seek to receive the benefit of the bargain, which precludes the Government from seeking a sentence higher than the guidelines.

Nor may sentencing be used to compensate for a failure of proof. In *United States v. Cordoba-Murgas*, the Second Circuit vacated a sentence where the district court relied on alleged homicide conduct that could not be proven or charged, holding that due process forbids sentencing

UNITED STATES V. ROYA JAFARI-HASSAD
Docket No. 22-CR-545(S-2) (GRB)
Page 5 of 7

enhancements grounded in legally insufficient allegations of causation. 233 F.3d 704, 709–10 (2d Cir. 2000).

A "death resulted" narrative is not a minor sentencing detail; it is an attempt to reframe the case around an outcome that was not admitted, not charged as an element, and not proven. Second Circuit precedent forbids precisely this type of sentencing-stage re-trade of the deal.

## VI. The Record Does Not Establish Causation, and Speculation Cannot Support Sentencing Findings

Here, the Suffolk County Medical Examiner certified the cause of death as mixed drug toxicity (alprazolam, fentanyl, oxycodone) and ruled the manner of death accidental. That finding does not attribute death to any single substance and does not establish but-for causation attributable to Dr. Jafari-Hassad.

As to A.M.D., the Government concedes it cannot attribute the death to anything Dr. Hassad did.

As to FP, tragic as the death was, the Government elects to ignore the evidence that neither prescriber played a role in FP's death in favor accusing Dr. Hassad of having "exploiting her patients' opioid cravings to line her own pockets." That editorial comment is entirely contradicted by the actual evidence.

1. Dr. Hassad and the other healthcare professional treated FP for approximately the same period of time without incident. According to available records, FP received pharmaceutical-grade Xanax for depression and anxiety for over a year from a physician's assistant at a psychiatric practice, while also receiving pharmaceutical-grade Oxycodone from Dr. Hassad for painful injuries sustained after a motorcycle accident and a subsequent car accident.

2. Given the gap in time between the last prescription from Dr. Hassad and FP's death, Dr. Rapkiewicz observed that FP had a relatively low level of Oxycodone in his system at the time of his death and surmised that he had resorted to Fentanyl, which she said was at a level sufficient to cause death.

3. The only record of FP receiving Fentanyl was from his family's admission that he periodically received additional Xanax from an acquaintance, not a prescribing physician.

Rather than address the evidence in full, the Government buries and ignores it. Even under a preponderance standard, disputed sentencing findings must rest on reliable proof, not conjecture. *Shonubi*, 998 F.2d at 87. Where courts have upheld death-based sentencing consequences, they have done so only on developed records supported by admissible evidence and explicit findings— not inference-driven narratives.

## VII. Section 3553(a) Does Not Authorize a De Facto Death Enhancement

The Government asserts that the overdoses "throw into high relief" the seriousness of Dr. Jafari-Hassad's conduct. That assertion is rhetorical, not legal. Sentencing discretion must remain tethered to legally permissible considerations. *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008).

Section 3553(a) does not authorize the functional equivalent of a Guidelines enhancement where the Guidelines expressly do not apply. Moral outrage and generalized social harm cannot substitute for proof, causation, or statutory authority. *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006).

## Conclusion

The Government's January 18, 2026 submission is not a neutral response to the Court's inquiry; it is a sentencing stage effort to recast this case around overdose deaths that the Government concedes it cannot charge, cannot prove, and cannot causally attribute to Dr. Jafari-Hassad under *Burrage*. Allowing those deaths to nonetheless operate as an aggravating sentencing factor would impose additional punishment for conduct that was never admitted, never proven, and never incorporated into the Plea Agreement, the PSR, or the Sentencing Guidelines.

The Government now asks the Court to reach the same destination by a different route, invoking section 3553(a) to accomplish what the Guidelines and governing law do not permit. That request runs counter to the plea agreement, the evidentiary record, and settled limits on sentencing discretion.

Having conceded the absence of but for causation, the inapplicability of any death-based Guideline provision, and the inability to charge either death, the Government may not nevertheless ask the Court to rely on those deaths as a basis for increased punishment and of course it would be improper for the court to consider the deaths when imposing a sentence. Sentencing is not a forum for importing unprovable allegations or imposing the functional equivalent of a death resulted enhancement without evidence supporting the assertion, evidence which is glaringly absent here.

For these reasons, Dr. Jafari-Hassad respectfully requests that the Court disregard the Government's January 18, 2026 submission insofar as it relies on overdose deaths, deny any request whether express or implied for a death based upward variance, and sentence Dr. Jafari-Hassad based on the offense of conviction, the properly calculated advisory Guidelines range, and the lawful considerations set forth in 18 U.S.C. section 3553(a).

The Court's time and attention to this matter is greatly appreciated

Respectfully submitted,

/s/ *Matin Emouna*
MATIN EMOUNA
JAMES MISKIEWICZ
BRUCE A. BARKET
*Attorneys for Dr. Roya Jafari-Hassad*

UNITED STATES V. ROYA JAFARI-HASSAD
Docket No. 22-CR-545(S-2) (GRB)
Page 7 of 7

cc: AUSA Charles Kelly         charles.kelly@USDOJ.GOV
    AUSA Katherine Onyshko     Katherine.Onyshko@usdoj.gov